UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ELIONIDA TOLLESON,

                              Plaintiff,


     -vs-

                                                    DECISION AND ORDER
                                                    09-CV-6350 CJS

UNITY HEALTH SYSTEM,

                              Defendant.
_____


APPEARANCES

For Plaintiff:            Christina A. Agola, Esq.
                          1415 Monroe Avenue
                          Brighton, New York 14618

For Defendant:            Daniel J. Moore, Esq.
                          Joshua D. Steele, Esq.
                          Harris Beach LLP
                          99 Garnsey Road
                          Pittsford, New York 14534


INTRODUCTION

     This is an action alleging employment discrimination pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the

New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.*  Now before the

Court is Defendant's motion for summary judgment (Docket No. [#20]).  The application

is  granted.

1

BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most favorable to Plaintiff.  Defendant is a corporation which operates hospitals in Rochester, New York.  Plaintiff is a native of the Philippines, for whom English is her second language.  Plaintiff moved to the U.S. in 2004.  On October 22, 2007, Defendant hired Plaintiff for the position of "Food Service Assistant."  At the time, Plaintiff was four months pregnant.

The position of "Food Service Assistant" involved working both in the hospital kitchen, preparing meal trays for hospital patients, and in the hospital cafeteria, preparing meals for customers.  The written job description for the position states, in pertinent part:

> [E]mployee must consistently:
>
> ***
>
> Assembles and retrieves meals as required while maintaining good customer relations.
>
> ***
>
> Assembles resident [patient] trays and nourishment according to menu requirements, diet specifications and requests while utilizing proper food handling practices in a timely, organized manner.

Pl. Resp. to Stmt. of Facts [#27-3] at ¶ 16.  The process for assembling patient trays used an assembly line with four stations, each staffed by a single employee. *Id*. at ¶ 20. Each tray contained an "order ticket," which specified what food was to be placed on the tray. *Id*. at ¶ 22.  While assembling trays, Plaintiff was required to consult the order ticket and place the appropriate food items on each tray.  Plaintiff was also required to perform cleaning tasks and deliver meal trays to locations throughout the hospital using a large metal cart. *Id*. at ¶ 18.

Pursuant to Defendant's usual practice, Plaintiff received three weeks of training on the tray assembly line, which consisted of her working with a more experienced employee.  Plaintiff was only able to advance through the first of the four stations of the tray assembly process.  Moreover, at the end of the training period, Plaintiff was unable to consistently place the correct food items on patient trays in a timely manner.  On November 21, 2007, Plaintiff's supervisor, Lynn Orlando, gave her a verbal warning about her job performance.  Orlando prepared a written report concerning the verbal warning, which Plaintiff signed, and which states:

> Since her start date of 10/22/07 Nida has not shown the ability to complete her work in the allotted time periods.  Nida often relies on her co-workers to help complete her job duties.  She has not been able to perform on the patient trayline at the lunch meal without much assistance.  Nida moves very slowly when working in the dishroom and also when passing trays on the floors.
>
> Prescribed Corrective Action: Nida needs to complete her job duties quicker without relying on her co-workers to pick up the slack.

Pl. Appendix of Exhibits, Ex. E.  Plaintiff does not allege that this verbal warning was discriminatory. *See*, Pl. Deposition at p. 86.

Approximately one week after receiving this verbal warning, Plaintiff produced a doctor's note, indicating that because of her pregnancy, she was not able to lift, push or pull more than twenty pounds.  Such restriction affected Plaintiff's ability to deliver trays to patients, but not her ability to work on the tray assembly line.  Defendant maintains that because of this restriction, it did not require Plaintiff to move the tray delivery carts, which weighed more than twenty pounds.  Plaintiff, though, contends that one of her supervisors still told her to deliver trays.  However, it is unclear whether that supervisor

was aware of Plaintiff's restriction, and in any event, Plaintiff's immediate supervisor, Orlando, reiterated that Plaintiff should not push the carts.

Plaintiff nevertheless complains that when she initially presented her doctor's note, Orlando responded that if she had known Plaintiff was pregnant, she would not have hired her. *See*, Pl. Dep. at p. 44 (According to Plaintiff, Orlando stated, in sum or substance, "So if I know you were pregnant, you see, you cannot get this job because this job is hard shifts, it's fast, hurry, hurry, hurry, she told me like that."). However, Orlando denies making such a comment.

In the meantime, Plaintiff continued to work on the patient tray assembly line. On or about December 5, 2007, Orlando specifically observed Plaintiff while she worked assembling patient trays. According to Orlando, she witnessed Plaintiff make numerous errors assembling the tray orders. For example, Orlando states that several times Plaintiff failed to differentiate between butterscotch pudding and butterscotch cookies, which caused her to place the wrong items on trays, and in one case, resulted in her placing a cookie on a tray for patient who was supposed to receive only pudding, because the patient could not have solid food. Orlando also indicates that Plaintiff placed a turkey sandwich on a tray that required a ham sandwich. Furthermore, Orlando states that Plaintiff mistakenly placed ice cream on trays for patients on a clear-liquid restricted diet, rather than "'water ice,' which is similar to italian ice," and vice versa. Pl. Resp. to Stmt. of Facts at ¶ 35. Orlando also reportedly observed that Plaintiff

> could not differentiate between 'nectar liquids' and 'honey-thickened liquids,' the two different types of thickened liquids provided to patients with swallowing difficulties. This inability was dangerous because if a patient did not receive a beverage with the correct degree of thickness the liquid

4

could go into their lungs and be life threatening.

Id. at ¶ 36.  According to Orlando, Plaintiff's numerous errors caused her to ask Plaintiff whether she could read English, and Plaintiff responded that she could, but that she did not recognize the various foods because she did not eat those types of food. *Id*. at ¶ 37. Plaintiff counters that she only made one mistake while Orlando was observing her, which was to place a diet pudding on a tray that required a regular pudding.  However, as will be discussed further below, Plaintiff is not in a position to dispute Orlando's observations, since she admittedly has great difficulty in recognizing the various foods that were used in Defendant's kitchen, and therefore would not necessarily know when she made a mistake, unless she was told. *See*, Pl. Affidavit at ¶ 22.  Accordingly, at most Plaintiff can say that Orlando only *told her* about a single mistake that she had made.  Similarly, although Plaintiff complains that no one told her that her mistakes posed a risk to patient health, she does not dispute that such mistakes could in fact endanger patient's safety.

Overall, Plaintiff admits that she consistently made mistakes on the tray line, because of her upbringing in the Philippines and her unfamiliarity with common American foods.  For example, Plaintiff admits that the following statement is undisputed:

> Rather than provide Ms. Tolleson with a written warning, Unity continued to work with her until the end of her employment in an effort to improve her performance in the kitchen.  Unfortunately, Ms. Tolleson's performance in the tray line did not improve and she continued to make errors with respect to identifying and differentiating between different types of food.
>
> RESPONSE:  UNDISPUTED.

Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 55.  Plaintiff's admission on this point is

further punctuated by her contention that Defendant failed to specifically train her to

recognize foods. *See*, Pl. Affidavit at ¶ 22 ("Further, I received **no** training in identifying

foods, which is an essential function of my job.") (emphasis in original).  Such statement

only confirms that she could not adequately identify the various patient foods, even after

three weeks of training on the tray assembly line.

　　Plaintiff's deposition testimony further reveals the difficulty that she had

recognizing the various patient foods and placing them on the trays in a timely manner.

*See*, Pl. Deposition at pp. 36-41.  Rather than setting forth such testimony verbatim, it is

sufficient to note that Plaintiff admitted having great difficulty in recognizing the food

used in Defendant's kitchen, which she attributed to the fact that she was raised in the

Philippines and not the U.S. *Id*. at pp. 36-41, 74.  For example, Plaintiff stated that she

could not differentiate between different types of bread, because she ate rice instead of

bread.  The problem was so severe that Plaintiff sometimes skipped placing a particular

type of food on the tray, rather than risk making a mistake. *Id*. at p. 41; *see also*, Pl.

Resp. to Def. Stmt. of Facts [#27-3] at ¶ 95 ("UNDISPUTED"); *see also*, Pl. Dep. at p. 96

("Still it is hard for me to recognize the food that's making me make mistakes.").  Plaintiff

admits that she made more mistakes than even a per diem student who was working in

the kitchen. *Id*. at p. 103.

　　After observing Plaintiff on the tray line, Orlando sent an email to her supervisor,

Ms. Hamil, expressing concern about Plaintiff's performance.  Specifically, Orlando

stated that despite having received weeks of training, Plaintiff was not able to work on

the entire tray assembly line, and was making numerous mistakes, which raised a concern about patient safety. *Id*. at ¶ 39.  On December 5, 2007, Hamil forwarded Orlando's email to her supervisors, Anthony Rizzo and David Karpowich, and included her own concerns about Plaintiff's performance, namely, that Plaintiff did not have the ability to perform her job.  Hamil further stated that she had assigned an employee specifically to stand beside Plaintiff while she was assembling patient trays, to make sure that she did not endanger patient safety. *Id*. at ¶ 43.  Hamil indicated that she was particularly concerned about Plaintiff's inability to diffentiate between liquids for patients with swallowing difficulties. *Id*. at ¶ 44.  Moreover, Hamil related to Rizzo and Karpowich that Plaintiff could not perform other tasks within the department, because of her medical restrictions, and she asked whether Plaintiff could be reassigned or terminated. *Id*. at ¶ 45.  On December 6, 2007, Karpowich responded that Plaintiff's performance problems raised a difficult issue, because "[e]rrors on patient trays are not acceptable." *Id*. at ¶ 46.

Subsequently, during December 2007, Defendant had Plaintiff undergo a medical examination, which confirmed that she was restricted from lifting, pushing or pulling more than twenty pounds. Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 53.  Defendant also assigned Plaintiff to work more often in the cafeteria, in the hope that it would be easier for her, but Plaintiff continued to make mistakes related to mis-identifying foods. *Id*. at ¶ ¶ 56-57.  Plaintiff purportedly disputes this, although, she argues Defendant did not issue her any further warnings about her performance, not that she did not continue to make mistakes. *Id*.

During the first week of January 2008, Defendant decided to terminate Plaintiff's employment.  Specifically, it is undisputed that

> [t]he final decision to end Ms. Tolleson's employment as Food Service Assistant was made on or around January 9, 2008 as a result of seven to ten days of discussions regarding her continued performance issues and any alternative options that might be available.
>
> RESPONSE:  UNDISPUTED.

Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 65.  In that regard, Defendant's usual progressive discipline policy consisted of a verbal warning and two written warnings before an employee would be terminated.  In Plaintiff's case, Defendant only issued a single verbal warning, and no written warnings, which admittedly was a deviation from its ordinary policy.  Defendant indicates, however, that it did not follow that procedure because of its concern about patient safety, and because it did not believe that Plaintiff's poor performance was due to a lack of effort or to bad behavior, but  rather, that it was the result of her genuine inability to accurately identify the various types of patient foods and beverages. Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ ¶ 59-60.

On January 10, 2007, prior to being told anything about being terminated, Plaintiff visited one of Defendant's human resources offices and picked up forms to apply for short-term disability, related to her pregnancy.  Plaintiff's husband, James Tolleson, states that later that same day, someone from Defendant's Human Resources Office called their home and asked why Plaintiff was considering applying for disability leave, and he responded that it was pregnancy related.  He contends that the caller then told him that Human Resources had notified Plaintiff's supervisors that she had picked up paperwork for disability leave. James Tolleson Aff. at ¶ ¶ 4-6.  Defendant, though,

denies that anyone involved in the decision-making process concerning the termination of Plaintiff's employment knew, prior to making that decision, about Plaintiff's plan to request disability leave.

The following day, January 11, 2007, Hamil informed Plaintiff that she was terminating her employment as a Food Service Assistant, "due to her continued inability to perform the essential functions of her job." Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 61. Defendant continued to pay Plaintiff for several more weeks, while she looked for other employment within Defendant's corporate structure, but Plaintiff was not hired for any position. Plaintiff believes that her pregnancy was a factor in her not being rehired.

In May 2008, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission. On April 13, 2009, the EEOC dismissed the complaint, because it was unable to conclude that discrimination had occurred. See, Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 78.

On July 10, 2009, Plaintiff commenced this action, alleging discrimination because of her pregnancy. Following a period of discovery, Defendant filed the subject motion for summary judgment. Defendant contends that Plaintiff cannot establish a prima facie case, and that even if she could, it had a legitimate non-discriminatory reason for terminating her employment. Plaintiff opposes, maintaining that there are triable issues of fact that preclude summary judgment. On May 7, 2012, counsel for the parties appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary

judgment bears the burden of establishing that no genuine issue of material fact exists.

*See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make

a prima facie showing that the standard for obtaining summary judgment has been

satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof

at trial, the movant may satisfy this burden by pointing to an absence of evidence to

support an essential element of the nonmoving party's claim." *Gummo v. Village of

Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been

established, the burden shifts to the non-moving party to demonstrate "specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250 (1986).  To carry this burden, the non-moving party must present evidence

sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

The parties may only carry their respective burdens by producing evidentiary

proof in admissible form. FED. R. CIV. P. 56(c).  The underlying facts contained in

affidavits, attached exhibits, and depositions, must be viewed in the light most favorable

to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, it is

well settled that the party opposing summary judgment may not create a triable issue of

fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule*

*v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted).  Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829 (1985).

*Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v.*

*New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).[1]  "Title VII was amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), to enact Congress's determination that 'discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.'" *DeMarco v. CooperVision, Inc.*, 369 Fed.Appx. 254, 255, 2010 WL 889252 at *1 (2d Cir. Mar. 12, 2010) (*quoting Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983)).

*Retaliation*

Defendant maintains that Plaintiff cannot establish a retaliation claim, and the Court agrees.[2]  In that regard, the legal principles for retaliation claims are clear:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is " de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would

---

[1]It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den.* 522 U.S. 997 (1997).  Consequently, unless otherwise noted, references to Title VII herein are also intended to refer to the NYHRL.

[2]It is unclear whether Plaintiff is even attempting to assert such a claim, since she admits that the Complaint "does not contain a separate cause of action for retaliation." Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 84.  However, the Court is addressing it, since it arguably would be Plaintiff's strongest claim if she in fact had such a claim, given the issues of fact concerning the temporal proximity between her obtaining maternity-leave forms and being terminated, and given the fact that she need not be qualified for her position in order to assert a retaliation claim.

be sufficient to permit a rational finder of fact to infer a retaliatory motive."
*Id*. (internal quotation marks omitted).

If the plaintiff sustains this initial burden, "a presumption of retaliation
arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory
reason for the adverse employment action." *Id*. If so, "the presumption of
retaliation dissipates and the employee must show that retaliation was a
substantial reason for the adverse employment action." *Id*. A plaintiff can
sustain this burden by proving that "a retaliatory motive played a part in the
adverse employment actions even if it was not the sole cause[;] if the
employer was motivated by retaliatory animus, Title VII is violated even if
there were objectively valid grounds for the [adverse employment action]."
*Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

Significantly, it is well settled that "[t]he term 'protected activity' refers to action

taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores,

Inc.*, 202 F.3d 560, 566 (2d cir. 2000).  In deciding whether a particular activity amounts

to "protected activity," "the employment practices opposed by the plaintiff need not have

actually amounted to a violation of Title VII.  Rather, the plaintiff must have had a good

faith, reasonable belief that the underlying challenged actions of the employer violated

the law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).  "[I]mplicit in

the requirement that the employer have been aware of the protected activity is the

requirement that it understood, or could reasonably have understood, that the plaintiff's

[complaint] was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v.

National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

Here, Plaintiff maintains that Defendant fired her immediately after learning that

she was preparing to take short-term disability leave related to her pregnancy.  To the

extent that Plaintiff characterizes her actions, in obtaining forms and information

regarding such leave, as protected activity, the Court disagrees.  Merely requesting

disability leave or maternity leave is not protected activity under Title VII.  *See, Demers v.*

*Adams Homes of Northwest Florida, Inc.*, 321 Fed.Appx. 847, 852, 2009 WL 724033 at

*4 (11th Cir. Mar. 20, 2009)  ("[T]o engage in protected activity, the employee must still,

at the very least, communicate her belief that discrimination is occurring to the employer,

and cannot rely on the employer to infer that discrimination has occurred.  A simple

request for maternity leave would not suffice, because it alone would not announce

opposition to the discriminatory basis for its denial.") (citations omitted), *rehearing en*

*banc denied*, 347 Fed.Appx. 557 (11th Cir. Jun. 2, 2009) (table); *McCormick v. Allegheny*

*Valley School*, Civil Action No. 06-3332, 2008 WL 355617 at *16-17 (E.D. Pa. Feb. 6,

2008) ("Ms. McCormick merely requested maternity leave, which is neither participation

in a Title VII proceeding nor an act in opposition of discrimination.").

This in no way suggests that employers may penalize employees for taking

maternity leave.  Clearly, they cannot.  In the Court's view, though, the appropriate claim

is one for discrimination, not retaliation.  That is, while taking maternity leave may not

qualify as protected activity, an employer nevertheless cannot take an adverse

employment action against an employee for utilizing maternity leave, as such action is

analogous to taking action against her because of her pregnancy.  In *Smith v. F.W.*

*Morse & Co., Inc.*, 76 F.3d 413, 424 (1st Cir. 1996)  the First Circuit stated:

> It is settled under Title VII that an employer may not discharge an
> employee based on the categorical fact of her pregnancy.  By the same
> token, since a short-term inability to work is bound up with the very nature
> of pregnancy and childbirth, that disability is a pregnancy-related condition
> within the meaning of 42 U.S.C. § 2000e(k), and Title VII thus prohibits an
> employer from dismissing an employee in retaliation for taking an

authorized maternity leave.

(emphasis added).  Despite the use of the word "retaliation" in the preceding quote, the

First Circuit's analysis involved a claim of discrimination, not retaliation. *See, id.*[3]

Accordingly, an employer who discharges a qualified employee merely because

she takes maternity leave or pregnancy-related disability leave may be found liable for

disparate treatment, but not retaliation.  Below, the Court will consider Plaintiff's

disparate treatment claim, which includes the allegation that Defendant discriminated

against her because she was planning to take pregancy-related leave disability leave.

*Disparate Treatment*

Disparate treatment discrimination claims are analyzed using the well-settled

*McDonnell Douglas*[4] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that
> he or she (1) is a member of a protected [group] . . . .; (2) was qualified to
> perform the duties required by the position; (3) was subjected to an
> adverse employment action; and (4) the adverse employment action
> occurred in circumstances that gave rise to an inference of discrimination.
> *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).
> ***
> Once the plaintiff presents a prima facie case[5], the burden of production
> shifts to the defendant to articulate a legitimate, non-discriminatory reason
> for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*,
> 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the
> defendant's articulation of a legitimate, non-discriminatory reason, the
> presumption of discrimination arising from the plaintiff's prima facie

---

[3]Another district court has cited  *Smith v. F.W. Morse & Co., Inc.*, for the proposition that
"maternity leave is protected activity under Title VII." Baez-Viera v. Cooperativa Abraham Rosa, 2011 WL
3843869 at *11 (D.Puerto Rico Aug. 30, 2011).  This Court respectfully disagrees.

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[5] "A plaintiff's burden of establishing a *prima facie* case is *de minimis*.  The requirement is neither
onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239
F.3d at 467 (citations and internal quotation marks omitted).

showing " 'drops out of the picture,' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), and the burden of production shifts back to the plaintiff to adduce evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Id.* at 90 (*quoting Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

Assuming that a plaintiff establishes a prima facie case, and that the defendant provides a non-discriminatory reason for the employment action, at the third tier of the *McDonnell Douglas* test, the plaintiff is required "to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 470. If the plaintiff succeeds, such evidence may, or may not, establish the additional required proof of discriminatory intent:

16

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct.  In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v. Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)).  "The relevant factors . . . include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Id.* (internal quotation marks omitted).

In this case, Defendant contends that Plaintiff cannot establish a prima facie claim, because she was not qualified to perform the duties required by her position.  In that regard,

> [t]o show "qualification" sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff need not show perfect performance or even average performance.  Instead, she need only make the minimal showing that she possesses the basic skills necessary for performance of the job.

*Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (citations and internal quotation marks omitted).  "To determine whether an individual is qualified for purposes of establishing a prima facie case, the court's 'ultimate inquiry' is whether an employee's performance meets his employer's legitimate expectations." *Lewis v. Air France Corp.*, 88 CIV. 4136 (MBM), 1990 WL 49053 at *4 -5  (S.D.N.Y. Apr. 18, 1990) (citations omitted).  As the Second Circuit has stated,

> [i]n determining whether an employee's job performance is satisfactory, courts may-as they often must-rely on the evaluations rendered by supervisors.  After all, job performance cannot be assessed in a vacuum;

17

> the ultimate inquiry is whether an employee's performance meets his
> employer's legitimate expectations. Although courts must refrain from
> intruding into an employer's policy apparatus or second-guessing a
> business's decisionmaking process, they must also allow employees to
> show that the employer's demands were illegitimate or arbitrary.

*Meiri v. Dacon*, 759 F.2d at 995 (citations and internal quotation marks omitted).

Usually, the Plaintiff's burden on this point is easily met. *See, Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) ("The Supreme Court has used the adjective 'minimal' to describe the burden of establishing a prima facie case of discrimination in violation of Title VII, and we have likewise held that the plaintiff's burden of establishing a prima facie Title VII case is de minimis.") (citations and internal quotation marks omitted).  Nevertheless, courts have readily found a failure to meet this threshold where a plaintiff cannot perform the duties of the job or does not meet the requirements set by the employer. *See, e.g., Orlando v. Department of Transp., Commissioner*, No. 10–5142–cv, 2012 WL 129832 at *1 (2d Cir. Jan. 18, 2012) ("Appellee's failure to promote Orlando in 2007 cannot support a prima facie discrimination finding because he failed the test that was administered for the promotion that year. Therefore, he was not qualified for the position."); *Ruszkowski v. Kaleida Health System*, No. 10–1743–cv, 422 Fed.Appx. 58, 60, 2011 WL 1938550 at *1 (2d Cir. May 23, 2011) ("Here, Appellant cannot make out a prima facie case of discrimination under Title VII or the ADEA. With respect to the position of phlebotomy supervisor, Appellant cannot show that he was qualified for the position, as he admittedly had no prior supervisory experience.")

Defendant maintains that Plaintiff was not qualified to perform her job, and did not

perform the job to Defendant's expectations.  On this point, Defendant states that

Plaintiff was unable to recognize or differentiate between foods, which rendered her

unable to prepare meals for patient trays in the kitchen, or for customers in the cafeteria.

Significantly, Defendant contends that Plaintiff's shortcomings in this area posed a

danger to patient safety, since Plaintiff made numerous mistakes in placing the wrong

kids of food on patient trays.  In addition, Defendant contends that Plaintiff simply was

too slow in performing her assigned tasks.

Plaintiff maintains that she was qualified, and that any shortcomings in her

performance were the result of Defendant's failure to train her to recognize the various

food products that were being used. *See*, Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 60

(Stating that she "received **no** training in identifying foods.") (emphasis in original).  In

her memo of law opposing Defendant's motion, Plaintiff devotes a single paragraph to

this issue, as follows:

> Plaintiff worked for Unity for over three months as a Food Service
> Assistant.  Other than a verbal warning issued on November 21, 2007, two
> months before her termination, admonishing the Plaintiff not to ask her co-
> workers for help in completing arduous physical tasks[6] because of her
> pregnancy, there is no written record or any disciplinary actions, warnings
> or problems with respect to the Plaintiff *that Plaintiff was aware of* prior to
> her termination with regard to the reasons identified by the Defendant as
> the basis for her termination, i.e. the alleged failure to recognize certain
> foods.  It is undisputed on this record that Plaintiff was never verbally
> reprimanded, warned, or even spoken to about these behaviors that
> culminated in her termination.  That meets Plaintiff's burden of going

---

[6]Here, Plaintiff is mis-characterizing the verbal warning that she was given.  In this regard, she
suggests that she was told not to ask co-workers for help with "arduous physical tasks," suggesting that
she could not perform heavy work due to her pregnancy.  However, Plaintiff's counseling occurred prior to
her bringing her pregnancy to Defendant's attention.  Moreover, according to the report of that verbal
counseling, which Plaintiff signed, she was criticized for relying on co-workers generally to perform "job
duties" on the tray line, not "arduous physical tasks," as she maintains. See, Pl. Appendix Vol. II, Ex. E.

> forward concerning her performance on the job. *See Flores* [*v. Buy Buy
> Baby, Inc.*, 118 F.Supp.2d 425,] 430 [(S.D.N.Y. 2000)].

Pl. Memo of Law [#27] at pp. 6-7 (emphasis added).  In *Flores*, the case relied upon by

Plaintiff, the court found that the plaintiff established that she was qualified for her job,

because she worked for three months, without any "written record of any complaints,

disciplinary actions, warnings, or problems," and she was retained past her probationary

period. *Flores*, 118 F.Supp.2d at 430.

In this case, Plaintiff admits that she was hired on October 22, 2007, and then

received three weeks of training.  She further admits that one week after the completion

of her training, on November 21, 2007, she was given "a verbal warning for 'poor work

performance.'" Pl. Aff. [#27-4] at ¶ 4.  She argues, though, that this warning is really

irrelevant to this case, since it did not specifically involve her inability to recognize foods,

but rather, was directed at her habit of asking co-workers for help in performing her job.

However, the Court disagrees, since the verbal warning report, which Plaintiff signed,

specifically refers to her slowness and her inability to perform on the tray assembly line

without assistance.  Moreover, Plaintiff's suggestion that she was not notified about her

problems in identifying foods on the food tray assembly line is belied by her deposition

testimony, in which she indicates that she was repeatedly yelled at, approximately every

other day, for making mistakes on the tray line. See, e.g., Pl. Dep. at pp. 97, 99-101.  In

any event, as discussed above, it is undisputed that Plaintiff had significant problems

identifying food, which caused her to make mistakes on the tray line.  Accordingly, the

*Flores* case is factually inapposite.

Plaintiff nevertheless contends that there is an issue of fact as to her

20

qualifications, since Defendant should have trained her to identify food.  Essentially, her argument is that she would have been qualified to perform the job if Defendant had only provided her with more training.  However, Defendant was not required to provide Plaintiff with specialized training to overcome her peculiar and unfortunate inability to distinguish certain foods. *See, Gray v. Niagara Frontier Transp. Auth.*, No. CIV–82–103E, 1987 WL 14591 at *3 (W.D.N.Y. Jul. 21, 1987) ("Failure of an employer to provide on-the-job training is not per se a violation of any laws. Furthermore, Title VII does not demand that an employer give preferential treatment to [individuals protected by that statute].  . . .  Gray's argument that she should have been afforded an opportunity to train on the equipment at her own pace simply has no legal basis."). Plaintiff does not contend that Defendant provided her with less training than non-pregnant employees.

Furthermore, Plaintiff's insistence that she required such additional specialized training merely confirms that she was not already qualified to perform her job. *See, Faruq v. Wal-Mart Stores, Inc.*, No. 03-CV-0192E(SC), 2006 WL 181995 at *5 (W.D.N.Y. Jan. 24, 2006) ("Plaintiff merely claims that she requested managerial training and was denied such. By definition, therefore, she was not qualified for a managerial position.").

Nonetheless, Plaintiff argues that her inability to identify foods should not render her unqualified, since the ability to tell foods apart was not specifically listed on the written job requirements.  The Court, though, disagrees and find that such fact does not matter.  Defendant cannot reasonably be expected to have included the "ability to differentiate among common foods" on its list of job requirements, since most people have no such difficulty.  Unlike Plaintiff, most people would have no trouble

21

differentiating between white bread and wheat bread, or between butterscotch pudding and a butterscotch cookie. *See*, Orlando Dep. at pp. 49-53 (Plaintiff could not tell the difference between butterscotch pudding and a butterscotch cookie, or between ham and turkey); 66 (Plaintiff could not tell the difference between white bread and wheat bread). And even if they did, they would have been able to overcome that difficulty after weeks of training and months on the job.

Plaintiff also argues that the Court should deny summary judgment, since Defendant did not follow its progressive discipline policy. However, on this record, the fact that Defendant did not follow its progressive discipline policy does not create a triable issue of fact as to discriminatory intent. In that regard, Plaintiff's inability to differentiate foods presented a unique problem implicating patients' safety. Furthermore, any such triable issue of fact on this point would go to the fourth element of the prima facie case, and therefore could not remedy Plaintiff's failure to establish the second element.

Plaintiff further alleges that after her employment was terminated, Defendant did not make sufficient efforts to find her another job. *See*, Pl. Affidavit at ¶¶ 69-79. This argument lacks merit, since Defendant had no legal obligation to do so. Plaintiff is not asserting a failure-to-hire claim, and even if she were, she has not demonstrated a prima facie case.

Plaintiff also states, in conclusory fashion, that the true reason that she was terminated was because she was planning on taking maternity leave. *See*, Pl. Affidavit at ¶ 66. However, as discussed above, Plaintiff concedes that the decision to terminate her employment was actually made during the seven-to-ten-day period leading up to

22

January 9, 2008. See, Pl. Resp. to Def. Stmt. of Facts [#27-3] at ¶ 65.  Therefore, such

decision would have pre-dated Plaintiff picking up disability forms on January 10, 2008.

In any event, even though Plaintiff picked up the disability forms prior to being notified of

her termination, and even assuming Defendant had notice of such fact, it would go to

establish the fourth element of a prima facie case, and Plaintiff has still failed to

establish the second element.

Based on the discussion above, the Court agrees that Plaintiff cannot establish

that she was qualified for her position.

CONCLUSION

For the foregoing reasons, Defendant's summary judgment motion [#20] is

granted, and this action is dismissed with prejudice.

SO ORDERED.

Dated: Rochester, New York
      May 14, 2012

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge